**NO. 23-4257**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## BRANDON GRUNWALDT,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE**

————————

**CORRECTED BRIEF OF APPELLANT**

————————

**David Q. Burgess
David Burgess Law, PC
P. O. Box 18125
Charlotte, NC  28218
(704) 377-9800**

*Counsel for Appellant*

GibsonMoore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

## <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES.......................................................................iv

INTRODUCTION ..............................................................................1

STATEMENT OF THE ISSUES ...........................................................3

STATEMENT OF THE CASE..............................................................4

 A. Pretrial ..............................................................................4

 B. Trial .................................................................................5

  1. The Government's Evidence.......................................5

   a. Evidence As To The Charged Conduct...........................5

   b. Evidence As To Uncharged Conduct...............................8

  2. The Defense's Evidence.............................................12

 C. Motion For Judgment Of Acquittal At The Close Of All Evidence ..............................................................................21

 D. Jury Instruction As "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area Of Any Person"...........................................22

  1. The Government's Proposed Instruction ...................................22

  2. The Defense's Proposed Instruction .........................................23

  3. The District Court's Instruction .................................................23

 E. Jury Deliberations And Verdict ...........................................................25

SUMMARY OF THE ARGUMENT .......................................................25

ARGUMENT ...................................................................................29

i

I.      The District Court Abused Its Discretion By Giving An Instruction Misstating The Law As To What The Jury Could Consider In Deciding Whether The Videos Depicted A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area Of Any Person." ..................................................................29

        A.      Standard Of Review ..................................................................29

        B.      Discussion .................................................................................29

II.     The District Court Erroneously Admitted Evidence Of Internet Activity As To Legal Adult Pornography, On Grounds It Was Intrinsic, And Thereafter Compounded Such Error By Allowing Unsubstantiated Hearsay That One Of The Websites Included Child Pornography ..............................................................................34

        A.      Standard of Review ....................................................................34

        B.      Discussion .................................................................................35

                1.      The District Court Erroneously Admitted As Intrinsic Evidence Of Appellant's Internet History ........35

                2.      The District Court Erroneously Allowed Hearsay Evidence That One Of The Websites Included In The Internet History Contained Child Pornography ......38

III.    The District Court Erroneously Denied Mr. Grunwaldt's Motion For Judgment Of Acquittal As To All Counts ....................................39

        A.      Standard Of Review ..................................................................39

        B.      Discussion .................................................................................39

                1.      The Evidence Was Insufficient to Establish The Videos Depicted A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area." ......................................39

                2.      The Evidence Was Insufficient to Establish Mr. Grunwaldt Attempted To Produce Videos Depicting A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area." ...............................................41

CONCLUSION ....................................................................................................44

REQUEST FOR ORAL ARGUMENT ...................................................................44

CERTIFICATE OF COMPLIANCE ......................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases:**

*United States v. Amirault,*
   173 F.3d 28 (1st Cir. 1999) .............................................................31, 32, 34

*United States v. Blake*,
   No. 5:19-cr-00025, 2019 WL 3000804 (S.D. W. Va. July 9, 2019) .............36

*United States v. Boam*,
   639 F.3d 433 (8th Cir. 2011) ...................................................................42, 43

*United States v. Brizuela*,
   962 F.3d 784 (4th Cir. 2020) ..........................................................................35

*United States v. Brown*,
   579 F.3d 672 (6th Cir. 2009) ..........................................................................37

*United States v. Browne*,
   No. 20-965, 2022 WL 1063953 (D.N.J. Apr. 8, 2022) ..................................36

*United States v. Courtade*,
   929 F.3d 186 (4th Cir. 2019) ...................................................................*passim*

*United States v. Davis*,
   75 F.4th 428 (4th Cir. 2023) ...........................................................................39

*United States v. Dost*,
   636 F. Supp. 828 (S.D. Cal. 1986) ..........................................................*passim*

*United States v. Franz*,
   772 F.3d 134 (3d Cir. 2014) .....................................................................32, 34

*United States v. Halter*,
   No. 2:04-CR-189, 2005 WL 8166178 (S.D. Ohio Nov. 1, 2005) ................37

*United States v. Harvey*,
   No. 04–4995, 159 Fed. Appx. 451 (4th Cir. Dec. 8, 2005) ..........................36

*United States v. Heinrich*,
    57 F.4th 154 (3d Cir. 2023)....................................................31, 33

*United States v. Hodge*,
    354 F.3d 305 (4th Cir. 2004)...............................................34

*United States v. Johnson*,
    439 F.3d 884 (8th Cir. 2006)...............................................37

*United States v. Lohse*,
    993 F. Supp. 2d 947 (N.D. Iowa 2014).................................37

*United States v. McCauley*,
    983 F.3d 690 (4th Cir. 2020)............................................29, 33, 34

*United States v. Miller*,
    829 F.3d 519 (7th Cir. 2016).............................................32, 34

*United States v. Mynes*,
    21-4668, 2024 WL 277707 (4th Cir. Jan 25, 2024)...........28, 40, 41

*United States v. Pavulak*,
    700 F.3d 651 (3d Cir. 2016).................................................42

*United States v. Petroske*,
    928 F.3d 767 (8th Cir. 2019).............................................42, 43

*United States v. Pratt*,
    351 F.3d 131 (4th Cir. 2003)...............................................41

*United States v. Rodriguez*,
    No. 2:15-cr-00006, 2015 WL 3935838 (D. Utah June 26, 2015).................37

*United States v. Self*,
    No. CR10–8036, 2010 WL 4684019 (D. Az. Nov. 12, 2010) ......................38

*United States v. Shabazz*,
    887 F.3d 1204 (11th Cir. 2018)...........................................36

*United States v. Spoor*,
    904 F.3d 141 (2d Cir. 2018)..............................................32, 33

*United States v. Steen*,
     634 F.3d 822 (5th Cir. 2011)............................................................30

*United States v. Villard*,
     885 F.2d 117 (3d Cir. 1989)..........................................31, 32, 34

*United States v. Williams*,
     30 F.4th 263 (5th Cir. 2022)...........................................................36

## Statutes:

18 U.S.C. § 2251(a) ...............................................................................1, 4

18 U.S.C. § 2251(e) ...................................................................................33

18 U.S.C. § 2252A(a)(5)(B) ..................................................................1, 4

18 U.S.C. § 2256(2)(A)................................................................................4

18 U.S.C. § 2256(2)(A)(v)...............................................4, 25, 29, 34

## Rules:

Fed. R. Evid. 403 ................................................................................5, 38

Fed. R. Evid. 404(b)................................................................35, 37, 38

Fed. R. Evid. 801(b)..................................................................................38

Fed. R. Evid. 801(c)..................................................................................38

**INTRODUCTION**

At the heart of Mr. Grunwaldt's defense to the charges of production of child pornography under 18 U.S.C. § 2251(a), and possession thereof under 18 U.S.C. § 2252A(a)(5)(B), was that the videos he admittedly made depicted only nudity and not a "lascivious exhibition of the anus, genitals, or pubic area of any person." The parties proposed dueling instructions as to what the jury could consider in evaluating whether the videos depicted a "lascivious exhibition," while the district court settled on its own third version to which the defense objected.

The government proposed instructing the jury it could consider the six factors articulated in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), the sixth of which is "whether the visual depiction is intended or designed to elicit a sexual response in the viewer." Mr. Grunwaldt maintained that the jury's evaluation should be limited to an objective analysis within the four corners of the videos and thus objected to the inclusion of the *Dost* factors, particularly the sixth, which adds a subjective intent inquiry. JA79, JA82, JA325.

The district court's version differed as follows. First, contrary to the government, it did not include the six *Dost* factors as proposed by the government. Second, contrary to the defense, it did not limit the jury's evaluation to an objective consideration limited to the four corners of the videos; instead, the district court included a reworded version of the sixth *Dost* factor. The sixth factor is, "Whether

the visual depiction is intended or designed to elicit a sexual response in the viewer." *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986). The district court's slightly reworded version was, "intended to excite lustfulness or sexual stimulation of the viewer." JA388.

The instruction's inclusion of the reworded sixth *Dost* factor presents a matter of first impression which the Court was able to avoid in *United States v. Courtade*, 929 F.3d 186 (4th Cir. 2019)—should a "subjective-intent inquiry" be considered in evaluating whether an image depicts a "lascivious exhibition." *Id.* at 192.

In *Courtade*, the defendant argued the video at issue did not depict a "lascivious exhibition" but rather "mere nudity." *Id.* at 189-190. The Court agreed that a depiction of a nude minor will not "suffice to prove that the video meets the statutory definition" because its language "requires more than mere nudity, because the phrase 'exhibition of the genitals or pubic area' . . . is qualified by the word 'lascivious.'" *Id.* at 191 (citations omitted). After noting it lacked precedent interpreting "lascivious exhibition," *Courtade* recognized that other courts have looked to the six *Dost* factors as guideposts in determining whether an image depicts a "lascivious exhibition" but that such factors have been subject to criticism. *Id.* "Particularly divisive has been the sixth factor," which "potentially implicates subjective intent." *Id.* The Court concluded, however, it

need not "define the parameters of any subjective-intent inquiry" because "the video's objective characteristics—the images and audio contained within its four corners, irrespective of Courtade's private subjective intentions—reveal the video's purpose of exciting lust or arousing sexual desire within the plain meaning of 'lascivious exhibition.'" *Id.*

No more than forty-six minutes after receiving the district court's instruction, the jury—having seen no more than fifty-eight minutes of the five videos at issue, which totaled two hours, twenty-two minutes, and thirteen seconds—concluded each of the videos individually depicted the necessary "lascivious exhibition of the anus, genitals, or pubic area of any person" and found Mr. Grunwaldt guilty of all six counts.

## STATEMENT OF THE ISSUES

I.    Did the district court err in instructing the jury to consider Mr. Grunwaldt's subjective intent in deciding whether the videos depicted a "lascivious exhibition of the anus, genitals, or pubic area of any person"?

II.    Did the district court err in admitting evidence of Mr. Grunwaldt's internet activity as to legal adult pornography, on grounds it was intrinsic, and then later allowing unsubstantiated hearsay testimony that one of the websites included child pornography?

III.    Did the district court err in denying Mr. Grunwaldt's motion for judgment of acquittal on grounds the videos did not depict a "lascivious exhibition of the anus, genitals, or pubic area of any person"?

## STATEMENT OF THE CASE

**A.    Pretrial**

Mr. Grunwaldt was indicted with five counts of violating 18 U.S.C. § 2251(a) by employing, using, persuading, inducing, enticing, or coercing a minor to engage in "sexually explicit conduct" for the purpose of producing a visual depiction thereof, and one count of possessing the five videos in violation of 18 U.S.C. § 2252A(a)(5)(B). JA11-13. For purposes of the statutes at issue, "sexually explicit conduct" is defined under subsection (v) of 18 U.S.C. § 2256(2)(A) to include a "lascivious exhibition of the anus, genitals, or pubic area of any person." The alleged "sexually explicit conduct" at issue was a "lascivious exhibition of the anus, genitals, or pubic area of any person" under 18 U.S.C. § 2256(2)(A)(v). JA319.

Prior to trial, the government filed notice of intent to offer evidence of Mr. Grunwaldt's internet browser history, including "video link filenames," and "a list of titles" of video "favorites" from motherless.com, and search terms. JA18-19. The government argued the evidence was admissible as intrinsic to the charged child pornography charges. JA20.

Mr. Grunwaldt filed a motion seeking exclusion of such evidence. JA713. First, Mr. Grunwaldt argued it was not intrinsic to the charged child pornography offenses because it was of acts involving lawful adult pornography and thus not of the same kind as those with which Mr. Grunwaldt was charged. JA714-715. Second, Mr. Grunwaldt argued even if it were intrinsic, it should be excluded under Federal Rules of Evidence Rule 403 because it would be "inflammatory and unduly prejudicial." JA717. The district court orally denied the motion on grounds "the type of on-line history reflected in the notice is intrinsic to the crimes charged." JA34.

## B.    Trial

### 1.    The Government's Evidence

#### a.    Evidence As To The Charged Conduct

Forensic Investigator Amy Olsen testified as follows. As to the government's questions, "did you find any sexually explicit videos" as part of your examination, she answered yes. JA201, JA210.

As to the five videos, none of them showed the minor in the shower. JA228. They were created on February 16, 2020, March 2, 2020, March 8, 2020, August 14, 2020, and October 31, 2020. They totaled two hours, twenty-two minutes, and thirteen seconds. The February 16, 2020, video "was 26 minutes and 4 seconds in length." JA204. The March 2, 2020, video "was approximately 30 minutes and 50 seconds long." JA199. The March 8, 2020, video "was approximately 33 minutes

and 32 seconds long." JA214. The August 14, 2020, video "was 26 minutes and 52 seconds in length." JA216. The October 31, 2020, video "was approximately 18 minutes and 58 seconds in length." JA217.

As to the government's question regarding the February 16, 2020, video—did it "show her breasts and genitalia"—she answered yes. JA204. The video, however, was not published to the jury but was only admitted into evidence as Exhibit 8. In lieu of showing the video to the jury, the government published six clips as Exhibits 8C through 8H. JA205. These selected clips totaled approximately 10 minutes and 50 seconds. *See* Exhibits 8C-8H.

As to the government's question regarding the March 2, 2020, video—did it "show her breasts and genitalia"—she answered yes. JA199. The video, however, was not published to the jury but was only admitted into evidence as Exhibit 2. In lieu of showing the video to the jury, the government published clips marked as Exhibits 2C through 2H. JA218. However, the clips published as 2F and 2G were identical, each lasting three minutes and three seconds. None of the 14 jurors sitting when 2F and 2G were played for their attention, nor anyone else involved in the trial, appeared to notice they were identical. Thus, the clips played for the jury totaled six minutes and five seconds, or approximately 22% of the full video marked as Exhibit 2. *See* Exhibits 2F-2D.

As to the March 8, 2020, video, it showed the minor "coming in and getting undressed, getting ready to take a shower, so she was nude.  Getting in the shower, getting out and doing her – what she did when you get out of the shower.  Getting dried off, you can see her genitalia."  JA214.  The video, however, was not published to the jury but was only admitted into evidence as Exhibit 10.  In lieu of showing the video to the jury, the government published clips marked as Exhibits 10C through 10G.  JA215.  These selected clips totaled approximately 3 minutes and 30 seconds, constituting approximately 10 percent of the video.  *See* Exhibits 10C-10G.

As to the August 14, 2020, video, it showed the "minor victim going in, getting undressed, getting ready for a shower where she's naked, exposing her genitalia, is exposed to the camera, and then getting out of the shower, getting dressed . . . ."  JA216.  The video, however, was not published to the jury but was only admitted into evidence as Exhibit 11.  In lieu of showing the video to the jury, the government published clips marked as Exhibits 11C through 11E.  JA216.  These selected clips totaled 5 minutes and 45 seconds, constituting approximately 18 percent of the video.  *See* Exhibits 11C-11E.

As to the October 31, 2020, video, "the camera view was more so between the toilet and the shower view."  JA218.  It "showed the minor victim walking in to use the bathroom where her genitalia was exposed."  JA218.  Her "genitalia was exposed and her breasts were exposed multiple times."  JA218.  The video, however, was not

published to the jury but was only admitted into evidence as Exhibit 12. In lieu of showing the video to the jury, the government published clips marked as Exhibits 12C and 12D. JA218. These selected clips totaled 9 minutes and 32 seconds, constituting approximately 49 percent of the video. *See* Exhibits 12C-12D.

### b.    Evidence As To Uncharged Conduct

Special Agent Aaron Bode, who took the stand immediately following Ms. Olsen, testified as follows. Over defense counsel's objection, made as he was testifying to internet activity extracted by Investigator Olsen, "I should also add" it showed activity on a website entitled motherless.com, which "I've learned from speaking with our computer forensic analysts like Amy Olsen that they're trained in, that can on occasion have child pornographic material on there." JA240. Investigator Olsen did not testify that motherless.com had ever included child pornography.

In addition to this hearsay testimony, he also testified as to the data extraction reports prepared by Investigator Olsen regarding Mr. Grunwaldt's iPhone and iPad, admitted into evidence respectively as Exhibits 3 and 6.

First, as to Exhibit 3 relating to the web history for the iPhone, it showed: (1) on September 26, 2020, the accessing of videos entitled "Beach Beauties Caught on Hidden Camera Claim," "Daddy Sets Up Spy Cam to See his Daughter Naked," and "Roommate Shower Spy," and a search on motherless.com for "hidden cam" the viewing of files entitled "Hidden Cam Masturbation," "Plain Perving on my

Daughter," "Another Daughter Spy Cam," "Hidden Cam Amateurs," "Beach Spy" and "Cute," JA246-247; (2) on October 4, 2020, searches on motherless.com for "masturbation spy" and accessing videos called "Teen Masturbates 32.FLV," "Masturbation spy," and "Sexy Teen Caught Masturbating in Shower," JA247-248; (3) on October 30, 2020, the accessing on motherless.com of a video called "Daddy's Little Girl" and some "favorites" called "Hidden Cam Collection," JA248.

Second, as to Exhibit 6 relating to the web history for the iPad, it showed: (1) on February 27, 2020, motherless.com was accessed and there were searches for "Dad catches," "Daughter caught," "Daughter caught masturbating," JA239; (2) on February 27, 2020, searches on Google and a video on Pornhub, "Daughter Almost Caught by Dad," JA241; (3) on March 3, 2020, Google searches for "My Perv Family," "Dad Crush Full Videos," and "Dad Crush Porn 2," and searches on motherless.com for "hidden" and websites "Hidden Cam Caught Several Hotties Dressing" and "Hidden Camera and Sister Strip Shower," JA242; (4) on March 4, 2020, searches for "hidden" on motherless.com and "accessing [a] video titled 'Teen Sister Masturbate in Shower,'" JA245; (5) on March 5, 2020, accessing motherless.com and viewing videos titled "Teen Daughters Suck and Fuck Daddy," "Underwater Solo Masturbation," Google searches for "Dad crush," accessing a website called dadcrush.com, and accessing videos of "Dads Fuck Teen Daughters," "Daddy-Daughter Porn," "Dad Crush," "My Stepdaughter Milked my Cock", "Dad

Crush," "Dads Fuck Teen Daughter," "Daddy-Daughter Porn," and "Dad Crush," JA243; (6) March 7, 2020, accessing motherless.com and videos on that site entitled "Sister Stripping for Shower," "18-year-old Sister Nude on Spy Cam," "Hidden Daughter," "Brother Uses Spy Cam to See his Sister Naked," and a video entitled "Hidden Cam Collection," JA244; (7) on April 19, 2020, accessing motherless.com and videos with the titles "Hidden Cam Shower Vids," "Aiming Teen and Shower" and a video entitled "Perving on my Daughter," a search for "hidden" and the accessing of videos titled "In the Bath Hidden Camera," a search on motherless.com for "hidden masturbation" and the accessing of videos, "Bubble Bath Blonde Masturbates." and "Teen Sister Masturbate in Shower," JA245; (8) on August 14, 2020, searches on motherless.com the accessing of videos entitled "Bubble Bath Blonde Masturbates," "Teen Sister Masturbate in Shower," "Checking out her," and "Daughter's friend." JA245-246.

As to motherless.com, it's a free website operated by Motherless Incorporated. JA249. It's advertised as a moral-free file-sharing website devoted almost exclusively to pornographic material. It's also a place where you can search for content. JA240. Users can post videos on motherless.com and "create whatever title that they want to, but it also creates like a thumbnail that you can see what content is in there." JA250. Special Agent Bode did not testify that Mr. Grunwaldt ever posted any videos or images on motherless.com.

Mr. Grunwaldt had been a user on motherless.com since 2012. JA247. Users on motherless.com could mark videos or images as "favorites." JA250. Mr. Grunwaldt had 830 videos and seven images marked as favorites. JA250. Out of the 830 videos, "daddy" appeared eight times, "daughter" appeared nine times, and "young girl" appeared twice. JA255. His favorites also included "multiple videos" that contained "teen," some included "bait," which is "a euphemism for masturbation," and "masturbate, masturbating, spy cam," "hidden," "hidden cam," and "voyeur." JA251.

As to the actual content of the videos, as opposed to the titles chosen by the user who posted the video, "he was able to verify some of the [830] videos that appeared in the URLs were actually on his favorites." JA251. He answered yes to the government's question, "And of the ones that you viewed, did you find that the content of the videos tended to be consistent with what the title was?" JA251.

Over the defense's objection to the government's question, what did the video "Perving on my Daughter" depict, on grounds it should be played rather than described, he testified that it "depicted a female in a bathroom undressing and taking a shower." JA246. After that, he gave his description of a video called "Teen Sister Masturbates in Shower," stating it "depicted a female naked in a shower and masturbating." JA252.

## 2.    The Defense's Evidence

Mr. Grunwaldt admitted to making the five videos after having become obsessed with the idea his 14-year-old daughter was taking her phone into the bathroom to take inappropriate images or videos of herself to send to a male. He did so because he needed to get the idea out of his mind by gathering hard evidence proving she was not doing what he feared she was doing.

In addition to his daughter, Mr. Grunwaldt had a son. JA265. Although their mother and he were never married, they cohabitated for eleven years, raising the children together, before separating in about 2016. JA265-266. The children continued attending school in Concord; however, Mr. Grunwaldt moved to "Bessemer City, which was probably about an hour and a half drive" from there to Concord. JA267. Given the distance, the parents agreed the children would generally live with their mother during the week and Mr. Grunwaldt on weekends. JA266-267.

To be closer to his children, he "moved to Concord into a three-bedroom townhouse with the, you know, kids having their own bedrooms so when they did visit on the weekends, they would stay there" in the beginning of 2019. JA267. His daughter was in eighth grade at the time and "started showing interest in, you know, wanting to have a boyfriend, even though in middle school." JA269. Mr. Grunwaldt told "her that if she was to start dating someone, that [he] would have to meet them, just as trying to make sure that they were an okay person and things weren't going to go in a direction [he] didn't feel was appropriate." JA269.

"So when she had the first boyfriend, [the two] talked about the rule that [he] would have to meet him first. And she agreed without any complaint." JA270. "We had set up a date to where we were to go roller-skating, myself, her brother, her, the young man that she was to meet, and his parents. And we all met there. And we all got along. So she continued to date him throughout her eighth grade year. And everything was well." JA270. He "met the boy's parents and the boy himself that first date, which was, you know, a chaperoned thing." JA270. "We went to the roller-skating rink when I met the parents." JA270.

"On several occasions there was [sic] functions at the school that they were attending, which when we met there, they would come over and sit next to me. So we became acquainted. There were several occasions where the young man joined us and we went to Carowinds." JA270.

In January, 2020, Mr. Grunwaldt "had to move in to [his] brother's house because he had a large house, and the third floor was basically separated so that we would have our own living space. It was supposed to be a temporary thing until I found a new place because they had upped the rent on the place that I was living." JA271. But "after a couple of months looking, [he] wasn't able to find something that [he] could get into because [he] needed to save up a little bit of money. And then COVID hit, which made it almost impossible to find a place. So [he] ended up staying in [his] brother's house for a lot longer than [he] intended, which was about a year." JA271.

13

"The living situation was a little bit different.  We were a lot closer in proximity.  There was only one bedroom, which was mainly for me to stay in during the week.  And then when the kids would visit, they could sleep on an air mattress or on the couch.  We also had a rollaway cot.  The bathroom is connected to the bedroom very closely.  And then another door from the bathroom out into the main living area." JA272.

After the first few months of being in "that closer proximity and having to share the bathroom," he

> noticed the amount of time that [she] was taking when she would go in there.  Prior to living in the condo, she was in and out in ten minutes, showered, done, and came out.  At this point, she was going in there for 45 minutes to an hour at a time.
>
> And you can tell just because you being so close proximity to the bathroom that she was not even in the shower.  So she was standing in the bathroom with the shower running without actually being in the shower.
>
> . . .
> She would be in there. I would hear her talking on her phone or listening to music or texting, which raised me concerns as to why she would take her phone into the bathroom in the first place.

JA272-273.

Mr. Grunwaldt was familiar with "girls on webcams doing things and taking videos of themselves and things like that." JA274-275.  He "absolutely" did "not want [his daughter] to be involved in any anything like that." JA275.  He "was concerned for her safety and what she was doing in there.  I didn't want her to mistakenly trust

someone that she would send a video to and then it end up on the internet." JA296. He "was hoping that there was nothing; that it was what [he] was hoping for." JA296.

He made the videos "to make sure she wasn't doing anything." JA296. He'd "had conversations with her regarding where she felt she was as far as intimacy. I would ask her if she was holding hands or if she had kissed anyone. And I felt that she wasn't at a point to where that's something she would do on her own." JA296-297. He "felt it was something she would be coerced into." JA297. "Later on when I noticed that -- like I said, when I found the lingerie, that is when I asked her about it." JA297.

And "what caused [him] to be concerned in the first place is that . . . at one point there was a video that [he] found of" his daughter's mother. JA275. "It was a video that disturbed me and put into my head that young girls are being taken advantage of or sending videos or pictures to boys that they think are their boyfriend and then somehow they end up on the internet." JA275-276.

He "was worried about her taking the phone into the bathroom." JA302. He tried, unsuccessfully, to prevent his 14-year-old daughter from taking her phone in the bathroom. JA302-303.

This was on top of his having "started noticing the behaviors that kind of led [him] to believe that she might be in there with her cell phone taking pictures of herself for either a boyfriend or who knows who." JA276.

15

He didn't just ask her if that's what she was doing because "[a]t first it was --
we had a lot of trust between us.  We were very close.  And if I would ask her
something, she would be up front and honest with me.  At this point I didn't want to
accuse her of anything or even give her an idea that she hadn't thought of because at
that point she was still very young and I don't believe she was interested in doing
things like that, so I didn't want to give her any suggestions.  So I just wanted to make
sure for myself that she wasn't doing any of these things before I even brought it up."
JA276.

 "I did, reluctantly, regretfully, decide to set up my phone, just so that I could
make sure there wasn't anything going on, to confirm for myself.  It really stuck in
my head and scared me due to some mental issues that I have with paranoia and
abandonment issues" and "some mistrust."  JA277.  He "got into [his] head that there
was something going on and it wasn't something that [he] could get out very easily
without proof." JA277-278.

He made the first video on February 16, 2020.  "I skimmed through it really
quickly just to see if there was any activity on the video that would lead me to believe
that she was in there taking photos of herself or videos of herself or FaceTiming with
her boyfriend or someone else."  JA278.  "There wasn't much on that one that led me
to believe anything, but it was still that idea that was in my head just because I didn't
see it that one time doesn't mean it wasn't happening."  JA278.

So he tried again on March 2, 2020. As before, he "[s]kimmed through it." He "[d]idn't really see anything." JA278

However, although he couldn't "recall exactly which video, but at some point [he] saw her in there dancing and taking her phone and putting it up to the mirror and then setting it on the counter and stepping back and modeling for herself." JA278.

So, he made another video on March 8, 2020. "There was nothing there that I could say was -- not that I wouldn't say it wasn't concerning, but not evidence of what I suspected." JA279. "At that point I had let it go." JA279.

After that, his daughter and he "talked about, you know -- I had asked her questions about where she was as far as interest because she had just broken up with the previous boyfriend and if there was somebody new. And she was reluctant to tell me." JA280. She also "started hanging out with a new group of friends. She had asked me to take her over to this friend's house so that she could hang out with these friends." JA280. "It eventually became apparent that the boy, who I dropped her off at his house -- she was interested in. And I discovered that through having conversations with her. And she was reluctant to even tell me about him." JA280.

"So at that point I started probing a little bit more, like why aren't you going to tell me about him? We've always talked. We've always been open. What's going on with this one specifically that makes you not want to talk about him?" JA280. "She told me that she wasn't interested in him; that they were just friends. But

17

eventually she let loose that she was interested in him." JA280. "At one point I reiterated our rule that, you know, I had no problem with you dating him. But you know, we got to go out sometime, go to lunch so I can meet him, maybe meet the parents so that we can do this officially and all would be well." JA274. "That made me feel like there was something she was hiding from me. And that was about the first time that I've ever seen her actually try to hide something from me. So it really hurt me a lot." JA281.

After that, he learned that she lied to him about where her mother took her after picking her up at his house. JA281-282. So, "confronted her about that." JA282. "That really hurt me much more than anything, because it was the first time that I had discovered that she was not honest with me." JA282. You "know, maybe not sharing is a little different, but this time she flat-out lied to me." JA282.

One weekend after that, we "discussed this boy -- it was a three-day weekend, so I also had them that Monday. She had asked me to take her to hang out with these friends on that Monday. And I asked her who was going. She told me it was going to be him, this boy, and his grandmother. And I had stated to her that sounds more like a date. And at that point she admitted, yeah, it's a date. And I reiterated the rule that, you know, okay, that's fine, but I need to meet him before this happens." JA282-283.

"So we had that entire weekend, and I told her at some point we can set this up. You can go with him on Monday. But I need to meet him. I told her to call him or set up something with the parents so that we could get together, have lunch, do something. And that's when she refused." JA283.

"A little bit after that, after the kids had gone for the weekend and I was at the house -- not by myself because my brother still lived there, but it was just me on the first floor. I was cleaning the bathroom and opened the cabinet and found a pair of fishnet stockings. I felt that it was evidence that she was doing inappropriate things in the restroom, in the bathroom." JA284.

So, on August 14, 2022, he made a fourth video. "It would have been late summer, right before school was about to get in into session, when she started telling me that she was interested in this boy. And then I also found the lingerie, which were two things that just set me off." JA284. "It would have been sometime during the week prior to that video, because that's the one that clued me in that there might be more going on than she's letting on." JA285.

"She would, in the previous videos, be off camera. At one point I even noticed that she was off camera with her phone and dancing, which caused me to believe that the area that she was standing in to do the dancing would be what I needed to capture." JA303-304. This time, the angle of the camera which captured the video did not depict the shower end of the bathroom but was instead directed toward the end of the room where the toilet was located, between the two doors. *See* Exhibits 11 and 11C-11E.

19

As before, he looked at it and there was nothing to confirm his fears.  JA285.

"Nothing that confirmed anything, but it was *still not enough to quell my suspicions*."

JA285 (emphasis added).

After that, she "continued to see him even without my consent.  At one point

she -- and again, it's that weekend that I had them for the four-day weekend.  After I

said that she wasn't going to be allowed to go on that date until I met him."  JA285.

As of October 31, 2020, "she was still seeing this boy even without my approval.  And

that was on Halloween, which we had gone, the two of us, and gone shopping for

costumes and things like that.  We did purchase her a costume that was in my opinion

age-appropriate."  JA286.  "But she wanted to -- she was excited about showing it off

to her friends and to her boyfriend.  I remember her specifically stating that."  JA286.

"So it concerned me that she would possibly show it off inappropriately if she was

modeling for someone."  JA280.

He made the last video on October 31, 2020.  JA286.  As with the previous

video, this time the camera angle which captured the video did not depict the shower

end of the bathroom but was instead directed toward the end of the room where the

toilet was located, between the two doors.  *See* Exhibits 12 and 12C-12D.

 The videos "were never intended to be viewed by anyone."  JA282.

 On cross examination, in response to the question, "Didn't you originally tell

[Detective Michael Maness] that you only took one video," he answered, "I didn't

20

specify any number." JA302. In response to the government's question, "You're saying right now that you did not tell him you only took one video," he answered "No. Not that I recall." JA302. In response to the government's question, "And didn't you later admit to him after they found that other video that you'd actually taken two videos," he answered, "I didn't specify any number." JA302. Detective Maness testified, "During the interview he got to three." JA176.

## C.    Motion For Judgment Of Acquittal At The Close Of All Evidence

In support of Mr. Grunwaldt's Motion for Judgment of Acquittal, defense counsel argued as follows:

> The evidence in Mr. Grunwaldt's case does not satisfy the definition of lascivious exhibition because the visual depiction of the minor in this case involved only mere nudity and does not contain any audio or visual evidence of deceit, manipulation, or the directing of the minor within its four corners.
>
> There is no evidence that the minor ever engaged in any sexual conduct whatsoever or any activity connoting a sex act. The mundane conduct of the visual depictions in this case is distinct from the conduct from the visual depictions in *Courtade* and analogous to the conduct in the visual depictions in *U.S. vs. Hillie*.
>
> Accordingly, the evidence in Mr. Grunwaldt's case does not satisfy the definition of lascivious exhibition.
>
> And since the act, by its terms, prohibits only visual depiction of a minor engaging in sexually explicit conduct, the evidence in Mr. Grunwaldt's case is expected to be insufficient as a matter of law to sustain a conviction in his case.

JA334-335. The motion was denied. JA337.

**D.    Jury Instruction As "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area Of Any Person"**

**1.    The Government's Proposed Instruction**

As to the meaning of "lascivious exhibition of the anus, genitals, or pubic area of any person," the government proposed the following, which included the factors articulated in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986):

> The term "lascivious exhibition" means a depiction that displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer. Not every exposure of the genitals or pubic area constitutes a lascivious exhibition. In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition, you should consider the following factors:
>
> (1) Whether the focal point of the visual depiction is on the minor's genitals or pubic area;
>
> (2) Whether the setting of the visual depiction makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity;
>
> (3) Whether the minor is displayed in an unnatural pose, or in inappropriate attire, considering the age of the minor;
>
> (4) Whether the child is fully or partially clothed, or nude;
>
> (5) Whether the visual depiction suggests coyness or a willingness to engage in sexual activity; and
>
> (6) Whether the visual depiction is intended or designed to elicit a sexual response in the viewer.
>
> A picture or image need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area. It is for

22

you to decide the weight or lack of weight to be given to any of these factors. Ultimately, you must determine whether the visual depiction is lascivious based on its overall content.

JA58-99.

### 2.    The Defense's Proposed Instruction

The defense objected to instructing the jury as to the *Dost* factors; instead, the defense argued the jury's evaluation of whether the videos depicted a "lascivious exhibition of the anus, genitals, or pubic area of any person" should be limited to an objective analysis within the four corners of the videos.    JA93, JA319.    The defense's proposal was as follows:

> "Lascivious exhibition" means a depiction in which a minor, or someone interacting with a minor, engages in conduct displaying their anus, genitalia, or pubic area in a lustful manner that connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.    Not every exposure of the genitals or pubic area constitutes a lascivious exhibition.

JA77-78.

### 3.    The District Court's Instruction

The district court declined to follow either of the parties' proposed jury instructions, instead proposing a third version.    First, contrary to the government, the district court did not include all six *Dost* factors.    Second, contrary to the defense, the district court's instruction did not limit the jury's evaluation to an objective consideration limited to the four corners of the videos.    Instead, the

23

district court included a reworded version of the sixth *Dost* factor. The sixth factor

is, "Whether the visual depiction is intended or designed to elicit a sexual response

in the viewer." *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986).

The district court's slightly reworded version was, "intended to excite lustfulness

or sexual stimulation of the viewer." JA388. Third, the district court added the

following language proposed by neither party: "Lasciviousness is not a

characteristic of the child photograph but of the exhibition which the photograph

sets up for an audience that consists of himself or others." JA388. The defense

objected that it should read, "lasciviousness refers to the conduct that the minor

was engaging in that was depicted." JA325. That request was denied. JA325.

    The district court instructed the jury as follows:

> In deciding whether there is a visual depiction that amounts
> to a lascivious exhibition of the anus, genitals or pubic area of a
> person, you should be guided by the following:

> The word "lascivious" is defined as of or marked by lust or
> exciting sexual desires.

> The term "lascivious exhibition" means a depiction which
> displays or brings forth to view to attract notice to the anus,
> genitals, or pubic area of children in order to excite lustfulness or
> sexual stimulation of the viewer.

> Lasciviousness is not a characteristic of the child
> videotaped, but of the exhibition which the producer sets up for an
> audience that consists of himself or others. Even videos of
> children acting innocently can be considered lascivious if they are
> intended to excite lustfulness or sexual stimulation of the viewer.

> However, not every exposure of the genitals, anus or pubic area of children constitutes a lascivious exhibition. More than nudity is required to render a video lascivious. Rather, the focus of the video must be on the anus, genitals, or pubic area in order to excite lustfulness or sexual stimulation of the viewer.
>
> In deciding whether the Government has proven beyond a reasonable doubt that the defendant acted for the purpose of producing a video of sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

JA387-388.

## E.    Jury Deliberations And Verdict

The verdict sheets were delivered to the jury for commencement of their deliberations at 11:23 a.m. JA399. The jury left the courtroom at 11:23 a.m. JA400. Forty-six minutes later, at 12:09 p.m., the "jury informed the Court that it had reached a verdict at 12:09 p.m.," JA401, which was guilty as to all six counts. JA402-403.

## SUMMARY OF THE ARGUMENT

I.    The district court abused its discretion by giving a jury instruction which incorrectly stated the law as to what the jury could consider in deciding whether the videos depicted a "lascivious exhibition of the anus, genitals, or pubic area of any person" as used in 18 U.S.C. § 2256(2)(A)(v). First, the district court's instruction included a slightly reworded version of the sixth of the six factors, which were articulated in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986) as guideposts in determining whether an image depicts a "lascivious exhibition." The sixth *Dost* factor is "whether the visual depiction is intended or designed to elicit a sexual

response in the viewer." *Id.* at 832. As the Court recognized in *United States v. Courtade*, 929 F.3d 186 (4th Cir. 2019), the *Dost* factors have been subject to criticism, "[p]articularly divisive has been the sixth factor," which "potentially implicates subjective intent." *Id.* at 191. In *Courtade,* the Court declined to apply the *Dost* factors, relying instead on the "video's objective characteristics—the images and audio contained within its four corners, irrespective of Courtade's private subjective intentions" in deciding the video depicted the necessary "lascivious exhibition." *Id.* The district court's inclusion of this subjective-intent inquiry was an abuse of discretion because it is unsupported by the statutory text and is inconsistent with *Courtade.* Second, the district court did not include, as requested by the government, the remaining five factors. As courts have recognized, the sixth factor is not a standalone factor mandating a separate substantive inquiry about the images; instead, it's simply useful as another way of inquiring into whether any of the other five *Dost* factors are met and thus courts have cautioned against the sole use of the viewer's subjective intent in evaluating lasciviousness. Thus, in addition to erring by introducing a subjective-intent inquiry, that error was compounded by depriving the jury of the remaining five factors for purposes of its decision. Together, these two errors went to the heart of, and seriously prejudiced Mr. Grunwaldt's defense, which was that the videos did not depict the "lascivious exhibition" which was necessary to a conviction.

II.     The prejudicial impact of the erroneous jury instruction was compounded by the district court having allowed evidence of Mr. Grunwaldt's uncharged conduct as to legal adult pornography activity on grounds it was intrinsic to the charged conduct as to child pornography and later allowing hearsay testimony that one of the websites included in that activity included child pornography.  Such evidence was not intrinsic given there was no clear link or nexus between the evidence and the story of the charged offense, and the purpose for which the evidence was offered was not actually essential.  The evidence which was actually essential to the jury's determination of whether the videos depicted a "lascivious exhibition" were the videos themselves.  More importantly, evidence of his legal adult pornography activity was substantially dissimilar to the charged conduct.  This error was compounded by the allowance of the hearsay testimony that one of the websites included child pornography.

III.     The district court erroneously denied Mr. Grunwaldt's motion for judgment of acquittal.  First, the district court erred in denying the motion as to the completed offenses.  In *Courtade,* the Court held that a depiction of a nude minor will not "suffice to prove that the video meets the statutory definition" because its language "requires more than mere nudity, because the phrase 'exhibition of the genitals or pubic area' . . . is qualified by the word 'lascivious.'"  *Id*. at 191 (citations omitted).  Instead, to constitute a "lascivious exhibition," it must be "a depiction which

27

displays or brings forth to view in order *to attract notice to the* genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer." *Id.* at 192 (emphasis added). As clarified in *United States v. Mynes*, No. 21-4668, 2024 WL 277707 (4th Cir. Jan 25, 2024), *notice is attracted to the* genitals, anus, or pubic area when the depiction is "focused" on "fully exposed" genitals, anus, or pubic area and "close-up shots" thereof are obtained. *Id.* at 4. Nowhere in the videos here is there a focus on the genitalia, anus, or pubic area. Instead, the videos depict a naked minor walking around in a bathroom. And there was certainly no effort to obtain any "close-up shots" of anything. Because the videos do not depict the necessary "lascivious exhibition," they do not constitute child pornography. The district court therefore erred in denying Mr. Grunwaldt's motion for judgment of acquittal as to the completed offenses. Second, the district court erred in denying the motion as to the attempted offenses. Mr. Grunwaldt did not attempt to use a zoom feature to focus on the genitals, pubic area, or anus. There is no audio on the videos showing he intended to depict a lascivious exhibition and didn't testify that's what he was trying to do; instead, he testified to the opposite. The district court therefore erred in denying Mr. Grunwaldt's motion for judgment of acquittal as to the attempted offenses.

28

## ARGUMENT

**I.** **The District Court Abused Its Discretion By Giving An Instruction Misstating The Law As To What The Jury Could Consider In Deciding Whether The Videos Depicted A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area Of Any Person."**

### A. Standard Of Review

A district court's decision to give a particular jury instruction is reviewed for abuse of discretion, and whether a jury instruction incorrectly stated the law is reviewed *de novo*. *United States v. McCauley*, 983 F.3d 690, 694 (4th Cir. 2020).

### B. Discussion

The district court abused its discretion by giving an instruction which incorrectly stated the law as to what the jury could consider in deciding if the videos depicted a "lascivious exhibition of the anus, genitals, or pubic area of any person" as used in 18 U.S.C. § 2256(2)(A)(v). *See id.* at 696. As recognized in *McCauley,* the analysis "begin[s] as always with the statutory text." *Id.* at 695; *see also United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019).

As noted in *Courtade,* the "Court has no precedent interpreting the term 'lascivious exhibition'" as used in § 2256(2)(A)(v)." *Id.* In *Courtade*, as here, the defendant argued the video at issue did not depict a "lascivious exhibition" but rather "mere nudity." *Id.* at 189-90. The Court agreed that a depiction of a nude minor will not "suffice to prove that the video meets the statutory definition" because its language "requires more than mere nudity, because the phrase 'exhibition of the

29

genitals or pubic area' . . . is qualified by the word 'lascivious.'" *Id.* at 191 (citations omitted). The Court then observed that other courts have looked to the six factors articulated in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) as guideposts in determining whether an image depicts a "lascivious exhibition" but that such factors have been subject to criticism. *Id.*

"Particularly divisive has been the sixth factor," which "potentially implicates subjective intent." *Id.* The Court concluded, however, it need not "define the parameters of any subjective-intent inquiry" because "the video's objective characteristics—the images and audio contained within its four corners, irrespective of Courtade's private subjective intentions—reveal the video's purpose of exciting lust or arousing sexual desire within the plain meaning of 'lascivious exhibition.'" *Id.*

Here, the district court erred in two ways. First, the district court erred by adding a subjective-intent element to the statutory text in the form of its slightly reworded version of the divisive sixth *Dost* factor. JA388. This was an error because, as courts have recognized, the plain and unambiguous statutory language does not include a subjective-intent element. *E.g.*, *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring) ("The sixth factor, which asks whether the visual depiction was intended to elicit a sexual response in the viewer, is especially troubling. Congress did not make production of child

30

pornography turn on whether the maker or viewer of an image was sexually aroused, and this *Dost* factor encourages both judges and juries to improperly consider a non-statutory element." (footnote and internal quotations marks omitted)); *United States v. Amirault*, 173 F.3d 28, 34 (1st Cir. 1999) (recognizing that if the focus of the inquiry is on an individual's "subjective reaction" to a photograph, "a sexual deviant's quirks could turn a Sears catalog into pornography."); *United States v. Villard*, 885 F.2d 117, 125 (3d Cir. 1989) ("We must, therefore, look at the photograph, rather than the viewer. If we were to conclude that the photographs were lascivious merely because [the defendant] found them sexually arousing, we would be engaging in conclusory bootstrapping rather than the task at hand—a legal analysis of the sufficiency of the evidence of lasciviousness.").

Second, the district court compounded its error by excluding the other five *Dost* factors. JA388. As several courts have recognized, the sixth factor is not a standalone factor mandating a separate substantive inquiry about the images; instead, it is simply useful as another way of inquiring into whether any of the other five *Dost* factors are met and thus courts have cautioned against the sole use of the viewer's subjective intent in evaluating lasciviousness. *E.g.*, *United States v. Heinrich*, 57 F.4th 154, 161 (3d Cir. 2023) (the sixth "factor, rather than being a separate substantive inquiry about the photographs, is useful as another way of inquiring into whether any of the other five *Dost* factors are met.") (citations

omitted); *United States v. Spoor*, 904 F.3d 141, 150 (2d Cir. 2018) ("'rather than being a separate substantive inquiry about the photographs,' the sixth Dost factor 'is useful as another way of inquiring into whether any of the other five Dost factors are met.'") (citations omitted); *United States v. Miller*, 829 F.3d 519, n.3 (7th Cir. 2016) ("the subjective intent of the viewer cannot be the only consideration in a finding of lascivious.  The statute does not criminalize Sears's catalogs because they are in the hands of a pedophile.  That is why courts have cautioned against the sole use of the viewer's subjective intent in evaluating lasciviousness."); *United States v. Franz*, 772 F.3d 134, 156 (3d Cir. 2014) ("The sixth factor is not 'a separate substantive inquiry about the photographs'" but rather is simply 'useful as another way of inquiring into whether any of the other five Dost factors are met.'") (citations omitted); *Amirault*, 173 F.3d at 35-36 ("We agree with the Third Circuit that in determining whether there is an intent to elicit a sexual response, the focus should be on the objective criteria of the photograph's design. As a result, 'the sixth *Dost* factor, rather than being a separate substantive inquiry about the photographs, is useful as another way of inquiring into whether any of the other five *Dost* factors are met.'") (citations omitted); *Villard*, 885 F.2d at 125 ("the sixth *Dost* factor, rather than being a separate substantive inquiry about the photographs, is useful as another way of inquiring into whether any of the other five *Dost* factors are met.") (citations omitted).

Similar to *McCauley*, the district court's sole use of the viewer's subjective intent in evaluating lasciviousness "went to the absolute heart of the defense." 983 F.3d at 695. The "stiffness of [the 15-year] minimum penalty" under § 2251(e) "demonstrates that Congress meant what it said when it wrote creating the visual depictions at issue here must be of a 'lascivious exhibition of the anus, genitals, or pubic area of any person.'" *See id.* at 696. Also similar to *McCauley*, the district court's instruction invited the jury to mistakenly believe it could consider Mr. Grunwaldt's intent in deciding whether the videos depicted the necessary "lascivious exhibition." *See id.* at 697.

Thus, considering the trial as a whole, the district court's erroneous instructions seriously prejudiced Mr. Grunwaldt's case. First, the trial focused on the question whether the videos depicted the necessary "lascivious exhibition." Mr. Grunwaldt argued that the jury's evaluation of the videos should be limited to the objective characteristics of the videos without regard to subjective intent. JA79, JA82, JA325. Second, on top of that, the jury was denied consideration of the remaining five *Dost* factors, which are intended to guide a jury's consideration of whether the divisive sixth factor was present. *See* JA388. Leaving the jury without the proper guidance in considering the divisive sixth *Dost* factor was an abuse of discretion which seriously prejudiced Mr. Grunwaldt's defense that the images did not depict the necessary "lascivious exhibition." *See Heinrich*, 57 F.4th at 161; *Spoor*, 904 F.3d at 150;

33

*Miller*, 829 F.3d at n.3 519; *Franz*, 772 F.3d at 156; *Amirault*, 173 F.3d at 35-36;
*Villard*, 885 F.2d at 125.

"When charged conduct does not fall in the heartland of a statute's proscription, the risk of prejudice becomes more palpable." *McCauley*, 983 F.3d at 698. Here, "it was of the upmost importance that the trial court give a proper jury instruction." *See id.* It "is quite possible that properly instructed, the jury would find [Mr. Grunwaldt's] conduct falls outside" the creation of a video which depicted the "lascivious exhibition of the anus, genitals, or pubic area of any person" as used in § 2256(2)(A)(v). *See id.* Following from that, it is also quite possible the jury would have acquitted him of the possession of child pornography charge as well.

Finally, the fact that the defense was seriously prejudiced is demonstrated by "the fact that the jury returned a verdict quickly after" receiving the instruction, which "shows a high likelihood that the jury was misled by the court's incorrect instructions. Indeed, we assume that the jury follows the court's instructions." *Id*.

## II. The District Court Erroneously Admitted Evidence Of Internet Activity As To Legal Adult Pornography, On Grounds It Was Intrinsic, And Thereafter Compounded Such Error By Allowing Unsubstantiated Hearsay That One Of The Websites Included Child Pornography.

### A. Standard of Review

The Court reviews the admission of evidence for abuse of discretion. *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004).

34

**B.      Discussion**

**1.      The District Court Erroneously Admitted As Intrinsic Evidence Of Appellant's Internet History.**

When the Court is "tasked with determining whether uncharged conduct is intrinsic to the charged offenses, [it has] consistently held that such conduct is intrinsic, and not barred by Rule 404(b), when it 'arose out of the same . . . series of transactions as the charged offense, . . . or is necessary to complete the story of the crime on trial.'" *United States v. Brizuela*, 962 F.3d 784, 793-74 (4th Cir. 2020) (ellipses in original and citations omitted).  The Court's "'complete the story' decisions reflect case-by-case, fact-based analyses." *Id.* at 794.  The Court's decisions "make clear that evidence must be 'necessary' to 'complete the story' of the charged offense." *Id.*at 795.  "This requires a hard look to ensure that there is a clear link or nexus between the evidence and the story of the charged offense, and that the purpose for which the evidence is offered is actually essential.  Otherwise, the 'complete the story' doctrine might be used to disguise the type of propensity evidence that Rule 404(b) is meant to exclude."  The "evidence must be probative of an integral component of the crime on trial or provide information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *Id.*

A hard look at the evidence at issue here reveals the following.  First, it's not "probative of an integral component of the crime on trial" nor did it "provide

information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *See id.* This is so because the evidence was of Mr. Grunwaldt's legal adult pornography activity—not of child pornography as alleged in the Indictment. JA246-255; JA407-701. As the Court has recognized, evidence is intrinsic where it involves "transactions [which] were substantially identical to the" offenses alleged in the indictment. *United States v. Harvey*, No. 04–4995, 159 Fed. Appx. 451, 456-57 (4th Cir. Dec. 8, 2005); *see also United States v. Williams*, 30 F.4th 263, n.3 (5th Cir. 2022) (recognizing evidence is not intrinsic where it's too dissimilar from the charged offenses to be intrinsic); *United States v. Shabazz*, 887 F.3d 1204, 1217 (11th Cir. 2018) (evidence is intrinsic where it's of "substantially similar" conduct.)

As to the charged conduct at issue here, evidence of uncharged acts involving legal adult pornography are not substantially similar to the charged conduct and thus are not intrinsic. *See United States v. Browne*, No. 20-965, 2022 WL 1063953 (D.N.J. Apr. 8, 2022) (holding inadmissible evidence of "child erotica" offered as intrinsic which depicted "young girls in a sexually suggestive way but may not be sufficiently lascivious to meet the legal definition of 'sexually explicit conduct'" because it's not illegal contraband); *United States v. Blake*, No. 5:19-cr-00025, 2019 WL 3000804, 3 (S.D. W. Va. July 9, 2019) (holding where the government seeks to introduce as intrinsic images it "will bear the burden of establishing that the images

depict children engaged in sexually explicit conduct"); *Cf. United States v. Brown*, 579 F.3d 672, 684 (6th Cir. 2009) (with regard to what could be considered for purposes of deciding whether an image is of a "lascivious exhibition" "we explicitly reject consideration of factors that do not relate directly to the taking of the images, such as past bad acts of the defendant, the defendant's possession of other pornography (pornography of another type or of other victims), and other generalized facts that would relate only to the general 'unseemliness' of the defendant."); *United States v. Johnson*, 439 F.3d 884 (8th Cir. 2006) (holding for purposes of Rule 404(b) that evidence in child pornography case would be inadmissible where it "did not constitute child pornography"); *United States v. Rodriguez*, No. 2:15-cr-00006, 2015 WL 3935838, 8 (D. Utah June 26, 2015) (recognizing for purposes of Rule 404(b) that evidence in child pornography case was inadmissible where the file names which don't reference "'boys' at all [and the] only reference to age is 'teen guys,' which could include legal pornography of an individual 18 or 19 years of age"); *United States v. Lohse*, 993 F. Supp. 2d 947, 960 (N.D. Iowa 2014) (recognizing for purposes of Rule 404(b) that evidence in child pornography case would be inadmissible where it "did not constitute child pornography"); *United States v. Halter*, No. 2:04-CR-189, 2005 WL 8166178, 2 (S.D. Ohio Nov. 1, 2005) (holding for purposes of Rule 404(b) in child pornography case that to "the extent the disk contains adult pornography, the images are not

admissible in this case"); *United States v. Self*, No. CR10–8036, 2010 WL 4684019 (D. Az. Nov. 12, 2010) (holding for purposes of Rule 404(b) in child pornography that "photographs of Defendant and his adult daughter naked, in his tractor-trailer, wearing only santa hats" were inadmissible because they "are not child pornography and likely would inflame the jury with suspicions of incest").

Thus, viewing legal adult pornography is simply not "substantially identical" to the production or possession of child pornography as charged in this case. Furthermore, evidence of Mr. Grunwaldt's lawful activity was not "actually essential" to the case—to the contrary, all the evidence the jury needed to determine whether he was guilty of producing or possessing a "lascivious exhibition of the anus, genitals, or pubic area of any person" were the videos themselves. Permitting them to be disgusted and inflamed by his legal adult pornography activity tended naturally to have interfered with the analytic abilities of the jurors and was therefore unfairly prejudicial under Rule 403.

**2.    The District Court Erroneously Allowed Hearsay Evidence That One Of The Websites Included In The Internet History Contained Child Pornography.**

"Hearsay" means "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Declarant" means "the person who made the statement." Fed. R. Evid. 801(b).

Here, over the defense's objection, Special Agent Bode testified, "I should also add" Mr. Grunwaldt's internet activity included a website entitled motherless.com, which "I've learned from speaking with our computer forensic analysts like Amy Olsen that they're trained in, that can on occasion have child pornographic material on there." JA240. The declarant to whom he attributed that statement, Investigator Olsen, testified immediately prior to Special Agent Bode's testimony. She did not testify that motherless.com had ever included child pornography. Consequently, the district court erred in allowing Special Agent Bode's testimony because it's clearly hearsay.

## III. The District Court Erroneously Denied Mr. Grunwaldt's Motion For Judgment Of Acquittal As To All Counts.

### A. Standard Of Review

The standard of review is *de novo*. *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023).

### B. Discussion

#### 1. The Evidence Was Insufficient to Establish The Videos Depicted A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area."

In *United States v. Courtade*, 929 F.3d 186 (4th Cir. 2019), which involved he issue whether a video depicted a "lascivious exhibition of the anus, genitals, or pubic area," the Court held that a depiction of a nude minor will not "suffice to prove that the video meets the statutory definition" because its language "requires

39

more than mere nudity, because the phrase 'exhibition of the genitals or pubic area' . . . is qualified by the word 'lascivious.'" *Id.* at 191 (citations omitted). Instead, to constitute a "lascivious exhibition," it must be "a depiction which displays or brings forth to view *in order to attract notice* to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer." *Id.* at 192 (emphasis added).

The videos at issue here do not meet that definition. They neither display nor bring forth to view in order to attract notice to the genitals, pubic area, or anus of any person. Instead, three of them show a minor in the bathroom, getting undressed, going into a shower with a curtain blocking the view into the shower, getting out, drying off, brushing her hair, and engaging in other grooming activities. *See* Exhibits 2, 2C-2H, 8, 8C-8H, 10, 10C-10G. The last two of the videos he made do not depict the shower end of the bathroom but are directed toward the end of the room, where the toilet is located between the two doors. *See* Exhibits 11, 11C-11E, 12, and 12C-12D.

None of the videos focus on the genitals, pubic area, or anus so as to attract notice thereto. Indeed, it is doubtful if the minor's genitals are even visible at all, but they certainly are not displayed or brought forth to attract attention to them as was the case in *United States v. Mynes*, No. 21-4668, 2024 WL 277707 (4th Cir. Jan 25, 2024). In *Mynes,* the Court concluded photographs depicted a "lascivious exhibition" where one was of a seven-year-old girl sitting "on a couch without any

40

underwear" and the images were "focused on her vagina, which was fully exposed." *Id.* at 4. "The series as a whole reflect[ed] not just a decision to focus the images on child victim 1's genitals, but to obtain 'close-up shot[s] of the girl's genitals' in the later image." *Id.* Such images, therefore, depicted the necessary "lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.*

Nowhere in the videos here is there a focus on the genitalia, anus, or pubic area. Instead, the video depicts a naked minor walking around in a bathroom. And there was certainly no effort to obtain any "close-up shots" of anything. Because the videos do not depict the necessary "lascivious exhibition," they do not constitute child pornography. The district court therefore erred in denying Mr. Grunwaldt's motion for judgment of acquittal.

> **2.    The Evidence Was Insufficient to Establish Mr. Grunwaldt Attempted To Produce Videos Depicting A "Lascivious Exhibition Of The Anus, Genitals, Or Pubic Area."**

The evidence was also insufficient to establish Mr. Grunwaldt attempted to produce or possess child pornography. To establish the crime of attempt, the government must prove (1) the defendant had the requisite intent to commit a crimes; (2) he undertook a direct act in a course of conduct planned to culminate in his commission of the crime; (3) the act was substantial, in that it was strongly corroborative of his criminal purpose; and (4) the act fell short of the commission of the intended crime due to intervening circumstances. *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003).

41

As to the first element, the government had to prove Mr. Grunwaldt intended to produce and possess a visual depiction "which displays or brings forth to view *in order to attract notice* to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer." *Courtade*, 929 F.3d at 191 (emphasis added). As *Mynes* clarifies, *notice is attracted to the* genitals, anus, or pubic area when the depiction is "focused" on "fully exposed" genitals, anus, or pubic area and "close-up shots" thereof are obtained. 2024 WL 277707 at 4. Here, the evidence was insufficient to prove beyond a reasonable doubt that Mr. Grunwaldt intended to produce such a visual depiction.

There do not appear to be many cases deciding whether the evidence was sufficient to prove an attempt to produce a "lascivious exhibition." *E.g., United States v. Petroske*, 928 F.3d 767 (8th Cir. 2019); *United States v. Pavulak*, 700 F.3d 651 (3d Cir. 2016); *United States v. Boam*, 639 F.3d 433 (8th Cir. 2011). In *Boam*, the defendant "adjusted the zoom feature in an attempt to tighten the focus of the camera on the area where the females' genitals would be if they were to face the camera." 639 F.3d at 440. The video clips showed the females generally from their shoulders to their calves, indicating the defendant attempted to obtain images portraying them as sexual objects and that their facial features were apparently of little or no importance. *Id.* "One of the resulting videos captured a close up of the minor's left buttock," and would've focused on the genitals or pubic area had she

merely turned around.  *Id.*  Based on that, *Boam* concluded a reasonable jury could have concluded that the secretly recorded videos were intended by the defendant to capture the necessary "lascivious exhibition."  *Id.*

In *Petroske*, the court also concluded there was sufficient evidence to prove attempt.  928 F.3d 767.  The court began by recognizing that lasciviousness may be found when an image of a nude or partially clothed child focuses on the child's genitals or pubic area and that intent is critical to establishing the attempt charges. *Id.* at 773-74.  The testimony of the defendant in *Petroske* indicated that he intended to capture the children while they were nude and that, in particular, he wanted the videos to capture depictions of their genitals.  *Id.*  Furthermore, the audio associated with the videos confirmed his trial testimony and demonstrated that he intended for the videos to be sexually suggestive.  *Id.* at 774.  The court therefore concluded there was sufficient evidence for a jury to conclude that Petroske attempted to produce child pornography.  *Id.*

Here, Mr. Grunwaldt did not use a zoom feature to attempt to focus on the genitals, anus, or pubic area of the minor.  He did not set the camera up to capture only from her shoulders to her calves, thus indicating he attempted to obtain images portraying her as a sexual object, with her facial features being of apparently little or no importance.  There is no audio on the videos showing he intended to depict a lascivious exhibition and didn't testify that's what he was trying to do; instead, he testified to the opposite.

The evidence did not establish that Mr. Grunwaldt attempted to produce the necessary "lascivious exhibition" and the district court erroneously denied his motion for judgment of acquittal.

## CONCLUSION

The Court should vacate and reverse Mr. Hoover's conviction.  Alternatively, the Court should remand for retrial.

## REQUEST FOR ORAL ARGUMENT

Mr. Grunwaldt requests oral argument on grounds of the important issues this case raises and such arguments would aid the Court's decisional process.

This the 3rd day of April, 2024.

*s/ David Q. Burgess*
David Q. Burgess
N.C. Bar No. 26239
P.O. Box 18125
Charlotte, NC 28218
(704) 377-9800 (voice)
(704) 565-4086 (fax)
david@davidburgesslaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with type-volume limits because, excluding the

parts of the document exempted by Fed. R. App. P. 32(f) (cover page,

disclosure statement, table of contents, table of citations, statement

regarding oral argument, signature block, certificates of counsel,

addendum, attachments):

this document contains <u>10,973</u> words.

2.     This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface
using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

This the 3rd day of April, 2024

*s/ David Q. Burgess*
David Q. Burgess
N.C. Bar No. 26239
P.O. Box 18125
Charlotte, NC 28218
(704) 377-9800 (voice)
(704) 565-4086 (fax)
david@davidburgesslaw.com

*Counsel for Appellant*
